1
2
3
4

**RIGRODSKY LAW, P.A.**
Gina M. Serra (#361172)
1091 North Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-8009
Email: gms@rl-legal.com

5

*Attorneys for Plaintiff*

6

[Additional Counsel on Signature Page]

7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

8
9
10

JHEROME DEGUZMAN, Derivatively on
Behalf of Nominal Defendant PETCO
HEALTH AND WELLNESS COMPANY,
INC.,

Case No. **'25CV1964 H    MMP**

11

Plaintiff,

**VERIFIED SHAREHOLDER**
**DERIVATIVE COMPLAINT**

12

v.

13
14
15
16
17
18

JOEL D. ANDERSON, R. MICHAEL
MOHAN, RONALD V. COUGHLIN, JR.,
SABRINA SIMMONS, BRIAN LAROSE,
MICHAEL NUZZO, GLENN MURPHY,
IRIS YEN, CAMERON BREITNER,
GARY BRIGGS, NISHAD CHANDE,
DAVID LUBEK, CHRISTOPHER J.
STADLER, MARY SULLIVAN,
CHRISTY LAKE, MAXIMILIAN
BIAGOSCH, and JENNIFER PEREIRA,

**DEMAND FOR JURY TRIAL**

19

Defendants,

20

and

21

PETCO HEALTH AND WELLNESS
COMPANY, INC.,

22

Nominal Defendant.

23
24

## **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

25

Plaintiff Jherome Deguzman ("Plaintiff"), by and through his undersigned

26
27

attorneys, brings this derivative complaint for the benefit of nominal defendant Petco

28

Health and Wellness Company, Inc. ("Petco" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Petco, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Spurbeck v. Petco Health and Wellness Company, Inc., et al.*, Case No. 3:25-cv-01667-JLS-VET (S.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of Petco against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least January 14, 2021 and June 5, 2025, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2.     Petco is a retail chain specializing in pet products and services, offering

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a wide variety of items including pet food, toys, accessories, and health products for animals. Additionally, many Petco locations provide services including grooming, training, and veterinary care.

3.    In the wake of the COVID-19 pandemic, pet adoption rates increased as individuals were spending more time at home. As a result of these trends, the Company experienced rapid growth and profitability. Company management largely attributed the Company's growth during this period to the emergence of younger and more health-conscious pet owners and an increasing culture of "pet humanization," which refers to the treatment of pets more like humans than property, resulting in increased consumer spending on pets. The Company represented itself as well-positioned to capitalize on these trends due to its shifting focus toward healthy, premium pet products.

4.    In reality, however, the Company's explosive growth was merely a temporary and unsustainable impact of the COVID-19 pandemic. Indeed, as pandemic-era consumer trends subsided, Petco's growth began to stagnate.

5.    The truth gradually emerged over a series of partially corrective disclosures beginning on May 24, 2023, when the Company revealed that consumers were beginning to favor cheaper products. Specifically, the Company reported a "demand shift" toward more "value-oriented" products. On this news, the price of Petco stock declined 18.17%, from a close of $10.18 per share on May 23, 2023 to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a close of $8.33 per share on May 24, 2023.

6.    On August 24, 2023, the Company lowered its fiscal year 2023 fiscal guidance due to a "shift in consumer spending and pressures on our discretionary business" and "an uptick in value seeking behaviors" among several consumers. On this news, the price of Petco stock declined 20.64%, from a close of $6.54 per share on August 23, 2023 to a close of $5.19 per share on August 24, 2023.

7.    On November 29, 2023, the Company again lowered its fiscal year 2023 fiscal guidance and revealed that it was beginning to offer cheaper and lower-quality pet food brands to respond to shifting consumer trends. On this news, the price of Petco stock declined 28.91%, from a close of $3.84 per share on November 28, 2023 to a close of $2.73 per share on November 29, 2023.

8.    Then, on March 13, 2024, Petco reported disappointing financial results due to "an erosion of market share" related to the Company not having "adapted quickly enough to recent changes in consumer preferences." On this news, the price of Petco stock declined 19.53% over the following two trading days, from a close of $2.56 per share on March 12, 2024 to a close of $2.06 per share on March 14, 2024.

9.    Despite the foregoing disclosures, the price of Petco stock remained artificially inflated as Company management continued to overstate the Company's growth prospects and minimize the adverse impacts that the Company's shifting strategy would have on its sales.

10.    The full truth emerged on June 5, 2025, when Petco reported, among other things, a 2.3% year-over-year decline in net sales. On this news, the price of Petco stock declined 23.2%, from a close of $3.62 per share on June 5, 2025 to a close of $2.78 per share on June 6, 2025.

11.    As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

12.    Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC, and Sections 10(b) and 21D of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Petco is headquartered in this District, Defendants have conducted business in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Securities Class Action is pending in this District.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# PARTIES

*Plaintiff*

18.    Plaintiff is, and has been at all relevant times, a shareholder of Petco.

*Nominal Defendant*

19.    Nominal Defendant Petco is incorporated under the laws of Delaware with its principal executive offices located at 10850 Via Frontera, San Diego, California 92127. Petco's common stock is traded on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "WOOF."

*Individual Defendants*

20.    Defendant Joel D. Anderson ("Anderson") has served as Petco's Chief Executive Officer ("CEO") and as a member of the Board since July 2024. Defendant Anderson is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Anderson received $18,258,291 in 2024 in compensation from the Company. As of May 13, 2025, Defendant Anderson beneficially owned 1,591,088 shares of Petco Class A common stock, worth roughly $5.1 million.[1]

21.    Defendant R. Michael Mohan ("Mohan") has served as a member of the Board since March 2021. Defendant Mohan additionally served as Petco's

---

[1] Valuations of the Individual Defendants' personal holdings of Petco Class A common stock are calculated based on the $3.21 per share closing price of Petco common stock on May 13, 2025.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

interim CEO from March 2024 until July 2024. During the Relevant Period, Defendant Mohan served as a member of the Audit Committee. Defendant Mohan is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Mohan received $260,390 in 2021, $290,014 in 2022, $305,003 in 2023, and $10,598,130 in 2024 in compensation from the Company. As of May 13, 2025, Defendant Mohan beneficially owned 4,183,308 shares of Petco Class A common stock, worth roughly $13.4 million and constituting 1.7% of the Company's total outstanding shares of Class A common stock.

22. Defendant Glenn Murphy ("Murphy") has served as Chairman of the Board since May 2024. According to the Company's public filings, Defendant Murphy received $11,420,537 in 2024 in compensation from the Company. As of May 13, 2025, Defendant Murphy beneficially owned 3,745,253 shares of Petco Class A common stock, worth roughly $12 million and constituting 1.5% of the Company's total outstanding shares of Class A common stock.

23. Defendant Iris Yen ("Yen") has served as a member of the Board since June 2023. During the Relevant Period, Defendant Yen served as a member of the Audit Committee. According to the Company's public filings, Defendant Yen received $373,965 in 2023 and $260,001 in 2024 in compensation from the Company. As of May 13, 2025, Defendant Yen beneficially owned 34,518 shares of Petco Class A common stock, worth roughly $110,803.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

24.     Defendant Cameron Breitner ("Breitner") has served as a member of the Board since 2016. During the Relevant Period, Defendant Breitner served as Chair of the Audit Committee. According to the Company's public filings, Defendant Breitner received $275,001 in 2024 in compensation from the Company. As of May 13, 2025, Defendant Breitner beneficially owned 750,000 shares of Petco Class A common stock, worth roughly $2.4 million. Defendant Breitner serves as a Senior Advisor to CVC Capital Partners ("CVC"), one of the Company's major stockholders. Defendant Breitner previously served as a Managing Partner and senior executive of CVC.

25.     Defendant Gary Briggs ("Briggs") has served as a member of the Board since 2018. During the Relevant Period, Defendant Briggs served as a member of the Audit Committee. According to the Company's public filings, Defendant Briggs received $250,505 in 2021, $260,014 in 2022, $269,170 in 2023, and $278,973 in 2024 in compensation from the Company. As of May 13, 2025, Defendant Briggs beneficially owned 70,085 shares of Petco Class A common stock, worth roughly $224,973.

26.     Defendant Nishad Chande ("Chande") has served as a member of the Board since 2016. Defendant Chande serves as Partner, U.S. Head of Consumer and Co-Head of Business Services at CVC.

27.     Defendant David Lubek ("Lubek") has served as a member of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Board since June 2023. Defendant Lubek serves as Managing Director, Direct Private Equity at Canada Pension Plan Investment Board ("CPP Investments"), one of the Company's major stockholders.

28.    Defendant Christopher J. Stadler ("Stadler") has served as a member of the Board since 2016. Defendant Stadler serves as Managing Partner and as a board member of CVC.

29.    Defendant Mary Sullivan ("Sullivan") has served as a member of the Board since 2021. Defendant Sullivan serves as Senior Managing Director & Chief Talent Officer at CPP Investments.

***Former Director Defendants***

30.    Defendant Ronald Coughlin, Jr. ("Coughlin") served as Petco's CEO from June 2018 until March 2024 and as Chairman of the Board from January 2021 until March 2024. Defendant Coughlin is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Coughlin received $4,025,740 in 2021, $19,590,453 in 2022, $7,139,463 in 2023, and $3,289,320 in 2024 in compensation from the Company.

31.    Defendant Christy Lake ("Lake") served as a member of the Board from 2018 until July 2025. According to the Company's public filings, Defendant Lake received $240,005 in 2021, $240,014 in 2022, $255,003 in 2023, and $260,001 in 2024 in compensation from the Company. As of May 13, 2025, Defendant Lake

beneficially owned 40,085 shares of Petco Class A common stock, worth roughly $128,673.

32.    Defendant Maximilian Biagosch ("Biagosch") served as a member of the Board from 2018 until June 2023.

33.    Defendant Jennifer Pereira ("Pereira") served as a member of the Board from 2016 until June 2023.

**_Officer Defendants_**

34.    Defendant Sabrina Simmons ("Simmons") has served as Petco's Chief Financial Officer ("CFO") since February 2025. Prior to serving in that role, Defendant Simmons served as a member of the Board from 2021 until February 2025. Defendant Simmons is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Simmons received $273,782 in 2021, $265,014 in 2022, $280,003 in 2023, and $285,001 in 2024 in compensation from the Company.

35.    Defendant Brian LaRose ("LaRose") served as Petco's CFO from August 2021 until February 2025. Defendant LaRose is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant LaRose received $1,930,713 in 2021, $5,093,606 in 2022, $1,732,080 in 2023, and $2,917,497 in 2024 in compensation from the Company. As of May 13, 2025, Defendant LaRose beneficially owned 729,081 shares of Petco Class A common

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

stock, worth roughly $2.3 million.

36.     Defendant Michael Nuzzo ("Nuzzo") served as Petco's CFO from May 2015 until August 2021. Defendant Nuzzo is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Nuzzo received $2,661,920 in 2021 in compensation from the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37.     By reason of their positions as officers and/or directors of Petco, and because of their ability to control the business and corporate affairs of Petco, the Individual Defendants owed Petco and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Petco in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Petco and its shareholders so as to benefit all shareholders equally.

38.     Each director and officer of the Company owes to Petco and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Petco, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.    To discharge their duties, the officers and directors of Petco were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Petco, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that Petco implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

43.    To discharge their duties, the officers and directors of Petco were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Petco were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Petco's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Petco conducted its operations, and, upon receipt of notice or information of imprudent or unsound

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Petco and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Petco's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.    Each of the Individual Defendants further owed to Petco and the shareholders the duty of loyalty requiring that each favor Petco's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Petco and were at all times acting within the course and scope of such agency.

46.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Petco.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

47.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

48.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

49.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

50.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Petco, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

52.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Petco and at all times acted within the course and scope of such agency.

**PETCO'S CODE OF CONDUCT**

53.    Petco's Code of Conduct begins with a commitment to "uncompromising honesty and integrity."

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

54.    The Code of Conduct applies to all of Petco's "directors, officers and employees," and violations of the Code of Conduct will lead to disciplinary action, including "terminating an employee, or seeking the resignation of a director, and/or recommending that a director not be nominated for re-election to the Board of Directors."

55.    With respect to conflicts of interest, the Code of Conduct states, in pertinent part:

> A "conflict of interest" can occur when your personal or business interests are adverse to – or may appear to be adverse to – the interests of the Company. You should avoid any personal activity, investment or association that could interfere or appear to interfere with your judgment concerning Petco's best interests. You are expected to act with integrity and good judgment, recognizing that personal or family relationships, outside business interests, or the acceptance of personal gifts from those doing business or seeking to do business with the Company, even when lawful, may give rise to legitimate concerns about conflicts of interest and favoritism.
>
> You may not exploit your position or relationship with Petco for personal gain. You should avoid even the appearance of such a conflict.

56.    With respect to legal compliance, the Code of Conduct states, in pertinent part:

> It is the Company's policy to comply with all applicable laws, including all laws and regulations relating to anti-trust and competition, international trade law, insider trading, advertisement, etc. as well as all applicable Company Policies, including, without limitation, the Company's Anti-Corruption Policy, International Trade Policy and Insider Trading Policy. Some of these policies are discussed in greater detail below. It is your personal responsibility to adhere honestly and in good faith to the standards and restrictions imposed by those laws, rules, regulations, and Company Policies.

57.    With respect to Petco's public reporting requirements, the Code of

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Conduct states, in pertinent part:

> In order to provide an adequate system of internal accounting and controls, the Company is required under U.S. federal securities laws and generally accepted accounting principles to keep books, records and accounts that accurately reflect all transactions. Also, the Company is required to provide full, fair, accurate, timely, and understandable disclosure in reports and documents that it files with or furnishes to the Securities and Exchange Commission ("SEC") and in all of its other public communications. The Company expects all personnel to ensure that those portions of its books, records, and accounts for which they have responsibility are valid, complete, accurate, and supported by appropriate documentation in verifiable form. Similarly, the Company expects all personnel to ensure that all reports and documents filed with the SEC and all other public communications for which they are responsible provide full, fair, accurate, timely, and understandable disclosure and that the same are filed on a timely basis.

58.     With respect to Petco's corporate assets, the Code of Conduct states, in pertinent part, that employees, officers, and directors are "responsible for protecting the Company's assets and ensuring their efficient use for legitimate purposes only."

59.     With respect to "[e]xternal [c]ommunications," the Code of Conduct states, in pertinent that "[t]he Company strives to maintain open, honest, and consistent communications."

## PETCO'S AUDIT COMMITTEE CHARTER

60.     Pursuant to Petco's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in its oversight of:

> (a) the accounting and financial reporting processes of the Company and its subsidiaries, including the audits of the Company's financial statements and the integrity of the financial statements; (b) the Company's compliance with legal and regulatory requirements; (c) the outside auditor's qualifications and independence; and (d) the performance of the Company's internal audit function and the

19
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's outside auditor.

61.    The Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- Meet to review and discuss with management and the outside auditor the annual audited and quarterly financial statements of the Company (including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") and the independent auditor's reports related to the financial statements.

- Recommend to the Board . . . whether the financial statements should be included in the Annual Report on Form 10-K.

- Receive reports from the outside auditor and management regarding, and review and discuss the adequacy and effectiveness of, the Company's internal controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Audit Committee by the outside auditor or management.

- Receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

- Review and discuss with the principal internal auditor of the Company: (1) the annual audit plan and the adequacy of internal audit resources; and (2) the results of the internal audit program.

- Annually review and discuss the performance and effectiveness of the internal audit function.

                    *      *      *

- Review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts, and

ratings agencies (when requested).

- Review and discuss the Company's practices with respect to risk assessment and risk management, and risks related to matters including the Company's financial statements and financial reporting processes, compliance, information technology and cybersecurity.

- Oversee the Company's compliance program with respect to legal and regulatory requirements, including the Company's code of business conduct and ethics and the Company's policies and procedures for monitoring compliance; and at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the compliance officer, who shall have the authority to communicate directly to the Audit Committee, promptly, about actual and alleged violations of law or the Company's code of business conduct and ethics, including any matters involving criminal or potential criminal conduct.

- Oversee procedures for handling reports of potential misconduct, including: (1) violations of law or the Company's code of business conduct and ethics; (2) complaints regarding accounting, internal accounting controls, auditing and federal securities law matters; and (3) the confidential, anonymous submission of concerns by employees regarding accounting, internal accounting controls, auditing and federal securities law matters.

## SUBSTANTIVE ALLEGATIONS

***Background***

62.     Petco is a retail chain specializing in pet products and services, offering a wide variety of items including pet food, toys, accessories, and health products for animals. Additionally, many Petco locations provide services including grooming, training, and veterinary care.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

63.     One of the Company's key business metrics is comparable sales, also referred to as same-store sales or "comp," a period-over-period measure of the change in net sales from physical locations and digital sites that have been operational for the applicable period.

64.     On December 3, 2020, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement"), in connection with an initial public offering ("IPO"), which, after several amendments, was declared effective on January 13, 2021. On January 15, 2021, the Company filed a prospectus on Form 424B4 with the SEC (the "Prospectus" and, with the Registration Statement, the "Offering Documents"), which incorporated and formed part of the Registration Statement.

65.     In the wake of the COVID-19 pandemic, pet adoption rates increased as individuals were spending more time at home. As a result of these trends, the Company experienced rapid growth and profitability. Leading up to and following the IPO, the Individual Defendants repeatedly represented that this growth was sustainable. Specifically, the Individual Defendants largely attributed the Company's growth during this period to the emergence of younger and more health-conscious pet owners and an increasing culture of "pet humanization," resulting in increased consumer spending on pets. The Company represented itself as well-positioned to capitalize on these trends due to its shifting focus toward healthy,

premium pet products.

66.     In reality, the Company's explosive growth was unsustainable, and as pandemic-era consumer trends subsided, Petco's growth began to stagnate. Despite this, the Individual Defendants continued to represent that its business model, focused on marketing healthy, premium products, would generate sustainable growth.

***Materially False and Misleading Statements***

67.     On January 14, 2021, the Company's common stock began publicly trading pursuant to the Offering Documents. The Offering Documents included a letter from Defendant Coughlin, which stated, in pertinent part:

> [O]ur business transformation has focused on driving a differentiated merchandise strategy, building sticky services, and completely revamping our digital offerings.
>
> *         *         *
>
> [O]ur current focus areas have generated attractive top- and bottom-line growth and position us for compelling long-term growth and profitability.
>
> *         *         *
>
> Suffice it to say, our business was strong before the pandemic, accelerated during the pandemic, and we expect it to continue to grow at an accelerated rate long after the pandemic passes.

68.     With respect to the Company's business model and competitive strengths, the Offering Documents stated, in pertinent part:

Our product strategy is built around an extensive offering that features premium owned and partner brands known for quality and innovation.

\* \* \*

Over the last three years, we have demonstrated the speed and depth of our innovation platform through the launch of 89 new brands and 5,000 new products. In 2016, we launched our first major proprietary pet food brand, WholeHearted, which features a premium ingredient panel, an attractive price point, quality packaging, and authentic branding that effectively targets millennial pet parents . . . . We also believe our Well & Good brand has similar potential to tap into customer demand for premium wellness products. Sales of our owned brand portfolio have grown at a 14% CAGR [compound annual growth rate] between Fiscal 2017 and Fiscal 2019, and for Fiscal 2019, our owned brands generated sales of $1.1 billion, or approximately 27% of total product sales, up from 17% of product sales in Fiscal 2015.

69.    On March 18, 2021, the Company issued a press release, announcing its fourth quarter and full year 2020 financial results (the "FY20 Release").[2] The FY20 Release quoted Defendant Coughlin as stating, in pertinent part:

On the heels of a successful IPO in January, we closed the year with a strong fourth quarter, and that momentum has carried into 2021.

\* \* \*

Our comprehensive petcare ecosystem focused on health and wellness, coupled with our digitally-led, multichannel experience is resonating with pet parents and generating significant competitive advantages that are evident in our performance. Our category continues to grow powered by the millions of incremental new pets in households, which is creating an annuity for years to come.

\* \* \*

---

[2] Petco's fiscal year 2020 refers to the twelve months ended January 30, 2021.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Petco [is] well positioned for long-term growth.

70.    The FY20 Release additionally stated that "[f]iscal 2020 revenue and comp[arable] sales both grew 11%, reflecting [the] continued success of Petco's transformation into an omnichannel Health and Wellness provider."

71.    During a related earnings call, hosted by the Company on the same day (the "FY20 Earnings Call"), Defendant Coughlin claimed that "premiumization and humanization trends" would generate sustainable growth for years:

> [W]hile the COVID environment has definitely provided a strong industry tailwind, looking forward, the millions of incremental new pets-oriented homes in the past 12 months, generated a predictable head spend annuity for years to come.
>
> And coupled with premiumization and humanization trends, the stickiness of a multi-channel customer relationships, we see strong growth long into the future.
>
> *    *    *
>
> Our transformation has delivered nine consecutive quarters of growth. In particular, we had momentum going into 2020 with strong top line performance. That performance accelerated through the pandemic and we're on an exciting growth trajectory even as COVID restrictions relax.

72.    Also during the FY20 Earnings Call, Defendant Coughlin highlighted the Company's shifting focus toward providing premium and healthy products as a competitive strength:

> Our own brands and exclusive merchandise deepen our competitive moats and power our growth. Our team has demonstrated the ability to

build brands and products that resonate with customers. In both Q4 and full year 2020, our own brands drove double digit growth and are rapidly approaching 30% penetration, further fortifying our differentiation from our competitors.

Our food brand WholeHearted, which we launched in 2016 is now a top three offering while our premium supplies brand Ready, grew almost 90% with aggressive expansion plans ahead. Complementing our own brand offering we also have exclusive partnerships for unique products. We're particularly excited about fresh foods projected to more than quadruple into a multi-billion-dollar category over the next several years according to industry forecasts.

We're focused on becoming a market maker in Fresh in 2021 are said to more than double are just food for dogs distribution, while our recent launch of premium price human grade on its kitchen has broken all our previous initial sales records. Overall, our own brands and brands exist to Petco in specific markets represent over half our portfolio not only enhancing our gross margin, but also creating competitive insulation.

73.     On April 5, 2021, the Company filed its 2020 annual report on Form 10-K with the SEC (the "2020 10-K"), which was signed by Defendants Coughlin, Nuzzo, Biagosch, Breitner, Briggs, Chande, Lake, Mohan, Pereira, Simmons, Stadler, and Sullivan. The 2020 10-K stated, in pertinent part:

We offer a highly differentiated owned and exclusive product assortment that engenders strong customer loyalty. We focused on three core product differentiating capabilities: nutritional expertise, exclusive partnerships, and a leading owned brand platform. As a testament to our commitment to pet health and wellness, in May 2019 we made the decision to pivot away from dog and cat food and treats that contain artificial ingredients making us the only major national retailer in the industry to take a stand against artificial ingredients in dog and cat food. We utilized a best brands strategy to form new partnerships with some of the most highly regarded premium food brands in the industry, such as Just Food For Dogs.

74.    On March 8, 2022, the Company issued a press release, announcing its fourth quarter and full year 2021 financial results (the "FY21 Release"). The FY21 Release quoted Defendant Coughlin as stating, in pertinent part:

Our results for the quarter and full year demonstrate that our focus on long-term, sustainable growth, powered by continued delivery against our strategic growth opportunities, is working.

*    *    *

We enter this fiscal year as a stronger company than ever. Our category remains strong and resilient; our competitive moats are deepening, and our world-class team is executing to deliver purpose driven performance.

*    *    *

[W]e're well positioned to drive enhanced long-term shareholder value.

75.    During a related earnings call, hosted by the Company on the same day (the "FY21 Earnings Call"), Defendant Coughlin stated:

One of the great things about pet is it's relatively immune to macroeconomic trends. Premiumization has been a multiyear trend. And even today, we're seeing its continuation in this environment. The best example of that is fresh frozen, where we have a higher ring, higher frequency and where we see outsized growth and by the way, better trip frequency.

In the higher end customer where we sit, we see pricing is relatively inelastic. And the other thing we've talked about before is 70% of our product is either owned, exclusive or covered by that. So our exposure to pricing is less than most other businesses. And . . . we haven't seen a decline in unit volumes.

76.    On March 24, 2022, the Company filed its 2021 annual report on Form

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10-K with the SEC (the "2021 10-K"), which was signed by Defendants Coughlin, LaRose, Biagosch, Breitner, Briggs, Chande, Lake, Mohan, Pereira, Simmons, Stadler, and Sullivan. The 2021 10-K stated, in pertinent part:

> Our product offering leverages a broad, carefully curated assortment of owned and exclusive merchandise and partnerships with premium third-party brands to provide customers with high quality nutrition without artificial ingredients, complemented by a wide variety of premium pet care supplies and companion animals. While we offer pet parents a full spectrum of product choices within our high standards of nutrition and quality, our assortment is weighted towards premium products to address the needs of the growing number of health-conscious pet parents.
>
> \*      \*      \*
>
> As pet care demand continues to grow, we believe we are well-positioned to expand our total addressable market through new offerings, and to capture an outsized portion of the growing market as a fully-integrated, comprehensive pet care provider. Our owned and exclusive merchandise is unique relative to other large players in the category, driving competitive insulation and focusing on the highest growth categories within the pet industry, like fresh and frozen, as well as premium nutrition and supplies more broadly.
>
> \*      \*      \*
>
> We believe that we have built deep competitive "moats" through the breadth and depth of assortment of premium health and wellness products.

77.    On March 22, 2023, the Company issued a press release, announcing its fourth quarter and full year 2022 financial results (the "FY22 Release"). The FY22 Release quoted Defendant Coughlin as stating, in pertinent part:

> Record fourth quarter sales, with cash flow exceeding expectations,

rounded out a solid fiscal year, once again demonstrating the enduring strengths of the pet category and Petco's ability to grow through economic cycles.

\*       \*       \*

As we look ahead, the pet category remains resilient and growing, and we'll continue to execute day-in and day-out while we progress our differentiated long-term growth strategy.

78.     During related earnings call, hosted by the Company on the same day (the "FY22 Earnings Call"), Defendant Coughlin maintained that humanization trends and Petco's focus on healthy and premium products were driving sustainable growth for the Company:

Turning to our differentiated merchandise, 2022 was another strong year. The addition of exclusive and formally independent only store brands such as Backcountry and Stella & Chewy's, have been powerful in driving our premium mix and accessing new customers. Meanwhile, our mix of popular own brand supplies and consumables including Reddy and WholeHearted, which both grew in revenue and penetration over the year, continue to meet the core humanization trend, while also catering to a variety of wallet sizes. Taken as a whole, our differentiated assortment is driving retention with our health-focused customers offering products unavailable in mass or many online channels and reducing our competitive promotional exposure.

\*       \*       \*

With the Fresh Frozen pet category expected to reach $6 billion within the next four years, and the direct-to-consumer pet segment growing faster than traditional pet e-commerce. These custom meals further enhance Petco's ability to lead the way in the megatrends of personalization and humanization

79.     Also during the FY22 Earnings Call, Defendant LaRose announced the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's fiscal year 2023 guidance, including adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") in the range of $520 million to $540 million and adjusted earnings per share ("EPS") in the range of $0.40 to $0.48.

80.    On March 28, 2023, the Company filed its 2022 annual report on Form 10-K with the SEC (the "2022 10-K"), which was signed by Defendants Coughlin, LaRose, Biagosch, Breitner, Briggs, Chande, Lake, Mohan, Pereira, Simmons, Stadler, and Sullivan. The 2022 10-K stated, in pertinent part:

> Our product offering leverages a broad, carefully curated assortment of owned and exclusive merchandise, providing customers with high quality and health-focused nutrition free from artificial ingredients, complemented by a wide variety of premium pet care supplies and companion animals. While we offer pet parents a full spectrum of product choices within our high standards of nutrition and quality, our assortment is weighted towards premium products to address ongoing humanization and premiumization trends in the market.
>
> *    *    *
>
> As pet care demand continues to grow, over the long-term we believe we are well-positioned to expand our total addressable market through new offerings, and to capture share of the growing market as a fully-integrated, comprehensive pet care provider. Our owned and exclusive merchandise is unique relative to other large players in the category, driving competitive insulation and focusing on long-term growth categories within the pet industry, like fresh and frozen food, as well as premium nutrition and supplies more broadly.
>
> *    *    *
>
> We believe that we have built competitive advantages through the breadth and depth of assortment of premium health and wellness products

81.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company's explosive growth was a temporary result of the COVID-19 pandemic; (ii) the Company's shifting focus toward offering healthy and premium products for animals was not a viable long-term business strategy; and (iii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Gradually Emerges***

82.    The truth began to emerge on May 24, 2023, during the Company's first quarter 2023 earnings call. Despite affirming previously reported fiscal year 2023 guidance, Defendant Coughlin disclosed that the Company was observing a shift in demand toward cheaper products. Specifically, Defendant Coughlin stated that "we're . . . seeing some value-seeking behaviors in our customer base. . . . For those customers, we saw demand shift into our own brand offerings such as WholeHearted, providing pet parents with a value-oriented yet health-focused alternative that positions us well competitively."

83.    On this news, the price of Petco stock declined 18.17%, from a close of $10.18 per share on May 23, 2023 to a close of $8.33 per share on May 24, 2023.

84.    On August 24, 2023, the Company issued a press release, announcing

its second quarter 2023 financial results (the "2Q23 Release"). In the 2Q23 Release, the Company revised its fiscal year 2023 guidance downward. Specifically, the Company provided adjusted EBITDA guidance in the range of $460 million to $480 million, down from the previously reported range of $520 million to $540 million, and adjusted EPS guidance in the range of $0.24 to $0.30, down from the previously reported range of $0.40 to $0.48. The 2Q23 Release quoted Defendant LaRose as attributing the downward revision to a "shift in consumer spending and pressures on our discretionary business."

85.    During a related earnings call, hosted by the Company on the same day, Defendant Coughlin revealed that "we . . . continue to see a bifurcation among pet parents, with ongoing migration to more premium foods on the one hand and an uptick in value seeking behaviors amongst the second cohort."

86.    On this news, the price of Petco stock declined 20.64%, from a close of $6.54 per share on August 23, 2023 to a close of $5.19 per share on August 24, 2023.

87.    On November 29, 2023, the Company issued a press release, announcing its third quarter 2023 financial results (the "3Q23 Release"). In the 3Q23 Release, the Company again revised its fiscal year 2023 guidance downward, providing adjusted EBITDA guidance of approximately $400 million and adjusted EPS guidance of approximately $0.08. The 3Q23 Release disclosed that, in response to adverse consumer demand trends, the Company was beginning to offer cheaper

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and lower-quality pet food brands:

> Our [Q3] results were below our expectations as we continue to navigate a challenging consumer environment and we are taking swift and decisive action to improve the performance of our business by broadening our appeal with customers and tightly managing costs and capital. This includes the introduction of the category's largest national cat and dog food value brands to meet the needs of all pet parents and deliver incremental profits over time.

88.    During a related earnings call, hosted by the Company on the same day (the "3Q23 Earnings Call"), Defendant Coughlin stated the following with respect to the Company's decision to offer cheaper and lower-quality pet food brands:

> Over the past years, we've seen significant changes that have impacted consumer spending. While we saw a surge in pet adoption during the pandemic period, coupled with stimulus that facilitated discretionary spending, the current economic environment means many consumers are increasingly discerning in their spending and actively seeking out more value. As a result, it's clear we must adapt our business to meet the needs of consumers in this environment. Consequently, we've launched an operational reset to improve the performance of our business, which is well underway and consists of four key pillars.
>
> The first and most significant is our focus on delivering value. We brought in the category's largest nationally available value brands in food and treats for both dog and cat. These brands include Friskies, Pedigree, Purina 1, Beneful, Temptations, and Milkbone among others. These will complement our best-in-class premium in fresh frozen food, treats, and toppers, allowing us to cycle out slower-moving brands and skews and focus on the highest-velocity skews.
>
> *    *    *
>
> While we remain committed to being a leader in the still rapidly growing premium, super premium, and fresh frozen categories, this is about choice. Bringing as many pets as possible into our health and wellness ecosystem. Whether chosen because of price sensitivity, brand

preference, a picky eater, or a combination of these, we believe in the current environment it's important that no pet is excluded.

\* \* \*

Our team has acted fast. These brands are already on shelves, having been set in the first few weeks of November. This is in addition to Fancy Feast, where we began expanding our assortment in Q2.

89.    Defendant Coughlin continued, adding that "the upfront costs and investment in labor and logistics to get these products on shelves has impacted near-term profitability."

90.    Later during the 3Q23 Earnings Call, Defendant LaRose explained that "[t]he largest driver of the change has been the shift of customers to more value-seeking process — products and the associated promotional and pricing environment related to those products. That's happened a bit faster than we anticipated."

91.    During the question-and-answer portion of the call, analysts expressed concern regarding the Company's shift in focus. For instance, an analyst from Evercore recalled that "during the IPO, you always mentioned . . . premiumization and premium food" and questioned the "margin impact" of the Company's "big shift in focus." In response, Defendant LaRose stated that "the margin rates on these products are lower than the average food margin of the rest of our chain," but explained that the shift could help the Company "get[] more customers."

92.    An analyst from UBS expressed similar concerns, as illustrated by the following exchange during the 3Q23 Earnings Call:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Michael Lasser – Analyst – UBS**

What is the competitive response you're expecting, not only from the price investments that you've been making, but now the addition of the widely distributed brands? How do you prevent this from becoming a race to the bottom?

**Defendant Coughlin**

Thanks for the question, Michael. So first, a lot of these products, actually all these products are controlled by MAP and the vendors. These are large scale vendors like the Nestle's of the world, the Mars of the world. These are large scale vendors who have a vested interest in making sure that their prices are managed in the market via MAP tools. So, there are controls in place in terms of that. Again, this is about driving more footsteps. I talked about the customer in South Carolina. There was another customer that I met in Northern California, and she was buying Fancy Feast, and I asked her if she bought that from us before? And the answer was, no, she didn't know we had it. She was buying it previously at a mass.

She was buying litter from us. So there's a lot of customers for whom they are looking for these products from us, whether it's our existing products, our existing customers or new customers that we have a better proximity to. I've met another customer who was buying it from another pet specialty player. So there is demand out there. We're hearing it from customers directly. If you look at our assortment, we can marry the premium brands that we have either exclusively or in limited distribution with these value-based brands. And again, in many instances, you have finicky cats who only eat one brand or only one flavor, and we're now expanding to those brands, and it's a matter of meeting those needs. 50%, 50% of our services customers don't buy food from us.

And a lot of instances is because they have a cat who has a certain product or they're more value conscious. I met a customer who had eight dogs and they needed to have an affordable product and they serve pedigree, but they loved our Groomers. Right? And so now we have at-bats with those customers and then those at-bats lead to us being able to attach. So that's more where we're focused on it. We will have aggressive marketing, but it's really about our differentiation as a one-stop shop that now includes these value brands.

**Michael Lasser – Analyst – UBS**

That's super helpful Ron. If I could ask one more quick follow-up. Is the decision to add value brands due to your perception that you're losing market share? And if that's the case, who are you losing market share to?

**Defendant Coughlin**

It's about customers, right? A business like ours is going to be successful when we listen to our customers. And whether that be customers migrating to channels where they can get these products or even our own customers looking for these products from a value pinch or seeing these services customers aren't buying food from us. It's about customers and bringing more customers through our doors. If you have double digit growth in the value products, that means customers are looking for those products. And we want to participate in that growth, not only from a share standpoint as you cite, but also to build our baskets and do the attach.

93.    As a result of these disclosures, the price of Petco stock declined 28.91%, from a close of $3.84 per share on November 28, 2023 to a close of $2.73 per share on November 29, 2023.

94.    On March 13, 2024, the Company issued a press release, announcing that Defendant Coughlin had stepped down from his positions as CEO, Chairman, and a member of the Board and that Defendant Mohan had been appointed interim CEO.

95.    The same day, Petco issued a press release, reporting that "comparable sales declined 0.9 percent year over year" for the fourth quarter of 2023 and reporting a "GAAP net loss of $1.3 billion, or $(4.78) per share, which includes goodwill impairment of $1.2B."

96.     During a related earnings call, hosted by the Company on the same day (the "4Q23 Earnings Call"), Defendant Mohan stated:

I recognize, we have not been executing the way we need to, in a number of areas, to deliver on our full potential. Most critically, we have not adapted quickly enough to recent changes in consumer preferences.

*     *     *

As a result, our in-store and omni-channel offering, was not appropriately aligned, with our customers' needs. This has led to two fundamental problems that, we need to address with speed. One, an erosion of market share as customers sought out alternatives, and two, a significant decline in profitability. Our work here, has already begun, with the reintroduction of value brands, in our consumable business, and adjusting our discretionary offering, to provide more balanced price points.

But simply reintroducing these products into our assortment is not enough. This more balanced assortment, must be supported with stronger retail and online customer experiences, and more disciplined execution. This starts with effective marketing to both existing, and potential customers. It builds with strong in-store and online merchandising. It is further supported by the education of Petco partners, to ensure they can effectively sell our complete offering.

And finally, it needs to be supported, by effective supply chain management that delivers inventory profitability with high-end stocks across our store base, and efficient delivery to omni-channel customers. Going beyond these critical near-term actions, we have to engage pet parents more effectively. We are focused on executing against high-quality, top-of-funnel customer acquisition and long-term retention, so more customers benefit, from the full Petco offering.

97.     On this news, the price of Petco stock declined 19.53% over the following two trading days, from a close of $2.56 per share on March 12, 2024 to a

close of $2.06 per share on March 14, 2024.

98.    Despite the foregoing disclosures, the price of Petco stock remained artificially inflated as the Individual Defendants continued to overstate the Company's growth prospects. For instance, during the 4Q24 Earnings Call, Defendant Mohan represented that "[i]mproving our customer experience, retail execution, and overall cost structure, will help us drive profit stabilization in the near-term, and growth in the medium and long-term," while failing to address whether such actions would negatively impact the Company's comparable sales.

99.    On April 3, 2024, the Company filed its 2023 annual report on Form 10-K with the SEC (the "2023 10-K"), which was signed by Defendants Mohan, LaRose, Lubek, Breitner, Briggs, Chande, Lake, Yen, Simmons, Stadler, and Sullivan. The 2023 10-K stated, in pertinent part:

> The U.S. pet care industry is large, serving millions of households with pets, and has exhibited steady growth driven by an increase in the pet population and trends in pet humanization and premiumization. Due to the essential, repeat nature of pet care, the industry has demonstrated resilience across economic cycles. However, during fiscal 2023, we observed a softening in discretionary spend and shifting consumer preferences for more value-centric products associated with the current inflationary macroeconomic environment. In response to this shifting demand, during fiscal 2023, we broadened our assortment to include more national brands and implemented strategic pricing actions to offer more balanced price points in an effort to appeal to a broader base of consumers.

100.    On April 9, 2024, the Company filed a current report on Form 8-K with the SEC, reporting that the Board had approved the termination of employment of

Darren MacDonald, Petco's Chief Customer Officer, effective as of April 12, 2024.

101.  On this news, the price of Petco stock declined 2.12%, from a close of $1.89 per share on April 9, 2024 to a close of $1.85 per share on April 10, 2024.

102.  On May 28, 2024, the Company announced additional "changes to [its] leadership team [to] accelerate Petco's initiatives to drive retail excellence as we execute on our operational reset," including the departures of the Company's Chief Operating Officer and Chief Merchandising and Supply Chain Officer.

103.  On this news, the price of Petco stock declined 8.48%, from a close of $3.42 per share on May 28, 2024 to a close of $3.13 per share on May 29, 2024.

104.  On February 18, 2025, the Company announced that Defendant LaRose had stepped down from his position as CFO and that he would be replaced by Defendant Simmons.

105.  On this news, the price of Petco stock declined 1.27%, from a close of $3.14 per share on February 18, 2025 to a close of $3.10 per share on February 19, 2025.

106.  Despite these disclosures, the price of Petco stock remained artificially inflated as the Individual Defendants continued to issue materially false and misleading statements. For example, on March 26, 2025, the Company issued a press release, announcing its fourth quarter and full year 2024 financial results (the "4Q24 Release"). The 4Q24 Release quoted Defendant Anderson as stating, in pertinent

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

part, that "[o]ur results in [Q4] demonstrate the progress we've made to return Petco to retail operating excellence. . . . I am confident our new leadership team is well-positioned to . . . set the business up for sustainable profitable growth."

107.   During a related earnings call, hosted by the Company on the same day (the "4Q24 Earnings Call"), Defendant Anderson claimed that the Company had "made great progress" on repairing its flawed business model and achieving "sustainable, profitable growth":

> Let me now unpack in greater detail our long-term phased approach to delivering on Petco's full potential. Starting with Phase 1, which is well underway. Over the last six months, I have relentlessly focused on: one, improving the operating model; two, giving our stores a voice; and three, restoring our retail fundamentals. Quite frankly, our foundational practices were not those of a successful consumer business and needed overhauling. We have made great progress on all three and are strengthening the foundation for Petco to return to sustainable, profitable growth.

108.   Defendant Anderson further stated:

> We've conducted a detailed review of our product assortment, and our optimizing it to more closely align to consumer demand and preferences. Specifically, we are allocating more of our focus in shelf-space to top-selling brands and high velocity SKUs across categories. In addition, we're continuing to sharpen our approach to pricing and have established a strategic pricing framework by category. This allows us to offer quality across the value spectrum with competitive price points, while also protecting margins.

*     *     *

> As part of our pricing work, we have refocused our promotional strategy to move away from low margin revenue and toward more

impactful targeted opportunities. We are now executing more targeted promotions and seeing favorable initial results.

109.   Also during the 4Q24 Earnings Call, Defendant Simmons conceded that "we will no longer chase sales at the expense of margin" and that, "for the full year, we expect overall net sales to be down low-single digits [compared] to last year," while understating how such a shift in strategy would impact Petco's comparable sales, attributing an anticipated, low-single digit decline in over year-over-year sales to the e "clos[ure] 25 net locations in 2024" and the "clos[ure of] between 20 to 30 net locations" in 2025.

110.   During the question-and-answer portion of the call, the following exchange occurred between an analyst from UBS and Defendants Simmons and Anderson:

**Michael Lasser – Analyst – UBS**
Joel, given some of the commentary and the plan that you've outlined, along with comparing Petco's performance in the fourth quarter to its largest pure-play pet specialty competitor, it would seem like the message is we are willing to sacrifice some sales and market share, at least in the short run, to improve the profitability and establish the foundation for the long run. So a, is that a fair interpretation? And b, how do you get the market share back, especially if customers are gravitating to other outlets? How do you rewin those customers over the long term?

\*       \*       \*

It looks like your guidance for this year is embedding an expectation that your comps are flat to maybe slightly negative. . . . [A]t some point do you run the risk of touching customer-facing activities that could result in it being more challenging to return to growth when that phase

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

will occur?

**Defendant Simmons**

I'll start. It's a great question, Michael. We are absolutely customer focused. And part of this whole foundation building that we're talking about 2025, which is so critical before we sort of turn even more of our focus to regrowth, is really making sure that we are addressing our customer needs.

\*      \*      \*

And there's many, many areas to go after. And this is something in my former life I have lots and lots of experience with. There are so many areas to go after that don't touch our customer and will in no way harm our customer experience. That's our #1 goal, is to please our customers.

**Defendant Anderson**

Yes. And Michael, I might just add to that. If you allow me some rounding, don't look too far deep into that because we shared with you we closed 25 stores last year. Most of those happened right at the end of the fourth quarter and then closing 20 to 30 this year. That right there just adds up to a couple of points of decline. And those were -- obviously, we wouldn't be closing those stores if they were profitable. So a lot of the improved EBITDA comes just from removing some stores that were dragging us backwards. But I think, Sabrina, you outlined it perfectly.

111.    Later during the 4Q23 Earnings Call, the following exchange occurred between an analyst from Morgan Stanley and Defendants Anderson and Simmons:

**Simeon Gutman – Analyst – Morgan Stanley**

And one follow-up. I mean no one explicitly asked what the implied comp is. I know we are talking -- we talked about it, but curious if you can share what implied comp is. And then what does the industry do in '25? Because it looks like it's growing slightly again. And curious if it ends up being better or what kind of assumptions that you're building in such that you can get comp to positive.

**Defendant Anderson**

42
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Yeah. Look, our assumption on it is that we're not waiting for the industry to recover. This 2025 is a self-help year for Petco, and we can clearly deliver on what we shared with you today by driving internal, operational and profit improvements that are not dependent on the industry. So, like other things, [Defendant Simmons] shared, if the industry grows and we take our fair share, that's another tailwind for us.

**Defendant Simmons**
Yeah. And just to underscore that, with the guidance down low single digits on sales, that's a range. We're not counting on a positive comp to achieve our adjusted EBITDA guidance. But there again, if it comes and we welcome all customers, if it comes, great, it's just a tailwind.

112.   On March 31, 2025, the Company filed its 2024 annual report on Form 10-K with the SEC (the "2024 10-K"), which was signed by Defendants Anderson, Simmons, Murphy, Mohan, Lubek, Breitner, Briggs, Chande, Lake, Yen, Stadler, and Sullivan. The 2024 10-K stated, in pertinent part:

[D]uring fiscal 2024, we continued to observe softening discretionary spending and shifts in consumer preferences for more value-centric products associated with the current inflationary environment, macroeconomic and political uncertainty and increased competition. In response to this shifting demand, we have broadened our assortment to include more national brands, and implemented strategic pricing and promotional actions to offer more balanced price points in an effort to appeal to a broader base of consumers. In connection with these efforts, in late fiscal 2024 we also began efforts to optimize our assortment and store labor model, and take costs out of all areas of our business in an effort to enhance our profitability and drive performance.

113.   The full truth emerged on June 5, 2025, when Petco issued a press release, announcing its first quarter 2025 financial results, which reported a 2.3% year-over-year decline in net sales and a 1.3% year-over-year decline in comparable

sales.

114.  On this news, the price of Petco stock declined 23.2%, from a close of $3.62 per share on June 5, 2025 to a close of $2.78 per share on June 6, 2025.

**Materially False and Misleading Statements in the Company's Proxy Statements**

115.  On May 26, 2021, Petco filed a proxy statement on Form DEF 14A with the SEC (the "2021 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Coughlin, Biagosch, Breitner, and Simmons to the Board and the compensation of certain of the Company's executive officers, including Defendants Coughlin and Nuzzo.

116.  With respect to the Company's financial reporting processes and legal and regulatory compliance, the 2021 Proxy stated that the Audit Committee is responsible for "assisting the board of directors in its oversight responsibilities regarding the integrity of our financial statements, our compliance with legal and regulatory requirements, the independent accountant's qualifications and independence and our accounting and financial reporting processes."

117.  With respect to the Company's risk management function, the 2021 Proxy stated:

> Our board believes that effective risk management and control processes are critical to Petco's safety and soundness, our ability to predict and manage the challenges that Petco and the pet category face and, ultimately, Petco's long-term corporate success.

Management is responsible for the day-to-day oversight and management of strategic, operational, legal, compliance, cybersecurity and financial risks, while our board, as a whole and through its committees, is responsible for the oversight of our risk management framework. Consistent with this approach, management reviews both the framework and certain specific risks with our board and audit committee at regular board and audit committee meetings as part of management presentations that focus on particular business functions, operations, or strategies, and presents steps taken by management to eliminate or mitigate such risks. While our board is ultimately responsible for the risk oversight of our Company, our audit committee has primary responsibility for management and mitigation of the risks facing our Company, including major financial, cybersecurity and control risks, and oversight of the measures initiated by management to monitor and control such risks.

Our audit committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our compensation committee has responsibility to review the risks arising from our compensation policies and practices applicable to all employees and evaluate policies and practices that could mitigate any such risk. Our nominating and corporate governance committee has responsibility to review risks relating to our corporate governance practices, including sustainability matters. These committees provide regular reports on our risk management practices to our board, as necessary. Our board believes that the Company's current leadership structure supports its risk oversight function.

118.    On May 5, 2022, Petco filed a proxy statement on Form DEF 14A with the SEC (the "2022 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Lake, Mohan, Pereira, and Stadler to the Board and the compensation of certain of the Company's executive officers, including Defendants Coughlin, LaRose, and Nuzzo.

119.    With respect to the Company's financial reporting processes and legal

and regulatory compliance, the 2021 Proxy stated that the Audit Committee is responsible for "assisting our board of directors in its oversight responsibilities regarding the integrity of our financial statements, our compliance with legal and regulatory requirements, the independent accountant's qualifications and independence, our accounting and financial reporting processes, and the audits of our financial statements."

120.  With respect to the Company's risk management function, the 2022 Proxy stated:

> Our board believes that effective risk management and control processes are critical to Petco's safety and soundness, our ability to predict and manage the challenges that Petco and the pet category face and, ultimately, Petco's long-term corporate success.
>
> Management is responsible for the day-to-day oversight and management of strategic, operational, legal, compliance, cybersecurity, and financial risks, while our board, as a whole and through its committees, is responsible for the oversight of our risk management framework. Consistent with this approach, management reviews both the framework and certain specific risks with our board and audit committee at regular board and audit committee meetings as part of management presentations that focus on particular business functions, operations, or strategies, and presents steps taken by management to eliminate or mitigate such risks. While our board is ultimately responsible for the risk oversight of our Company, our audit committee has primary responsibility for management and mitigation of the risks facing our Company, including major financial, cybersecurity, privacy, and control risks, and oversight of the measures initiated by management to monitor and control such risks. As part of the board's role in overseeing our risk management program, the board devotes time and attention to cybersecurity-related risks. Specifically, the board receives reports on cybersecurity matters and related risk exposures from management, including our Chief Administrative Officer, at least

twice a year and more frequently as needed. The audit committee also regularly updates the board on such matters and the board periodically receives reports from management directly.

In addition, as part of the board's strategic and risk oversight, the board oversees our ESG strategies. Throughout the year, the board receives reports from management and our nominating and corporate governance committee on key ESG matters, our actions around being a responsible company and corporate citizen, and our ESG reporting, which demonstrates our commitment to transparency and accountability of our goals and progress.

Our audit committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our compensation committee has responsibility to review the risks arising from our compensation policies and practices applicable to all employees and evaluate policies and practices that could mitigate any such risk. Our nominating and corporate governance committee has responsibility to review risks relating to our corporate governance practices, including ESG and other sustainability matters. These committees provide regular reports on our risk management practices to our board. Our board believes that the Company's current leadership structure supports its risk oversight function.

121.    On May 12, 2023, Petco filed a proxy statement on Form DEF 14A with the SEC (the "2023 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Briggs, Chande, and Sullivan to the Board and the compensation of certain of the Company's executive officers, including Defendants Coughlin and LaRose.

122.    With respect to the Company's financial reporting processes and legal and regulatory compliance, the 2023 Proxy stated that the Audit Committee is responsible for "assisting our board of directors in its oversight responsibilities

47
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

regarding the integrity of our financial statements, our compliance with legal and regulatory requirements, the independent accountant's qualifications and independence, our accounting and financial reporting processes, and the audits of our financial statements."

123.    With respect to the Company's risk management function, the 2023 Proxy stated:

> Our board believes that effective risk management and control processes are critical to Petco's safety and soundness, our ability to predict and manage the challenges that Petco and the pet category face and, ultimately, Petco's long-term corporate success.
>
> Management is responsible for the day-to-day oversight and management of strategic, operational, legal, compliance, cybersecurity, and financial risks, while our board, as a whole and through its committees, is responsible for the oversight of our risk management framework. Consistent with this approach, our enterprise risk steering committee comprised of key stakeholders throughout the Company works with management to identify, review, and update both the framework and certain specific short-, intermediate-, and long-term risks that we face, which are presented to our audit committee and board at regular audit committee and board meetings as part of management presentations that focus on particular business functions, operations, or strategies. Such presentations also identify steps taken by management to eliminate or mitigate such risks and report on how feedback from the audit committee and/or board regarding our enterprise risk management efforts (including how we address existing risks and identify significant emerging risks) is implemented. In this process, we also utilize a heat map that identifies the probability and impact of inherent risks that we face, which is presented to our audit committee and board and updated regularly. While our board is ultimately responsible for the risk oversight of our Company, our audit committee has primary responsibility for management and mitigation of the risks facing our Company, including major financial, cybersecurity, privacy, and control risks, and oversight of the measures initiated by management to

monitor and control such risks. As part of the board's role in overseeing our risk management program, the audit committee and board devote time and attention to cybersecurity-related risks. Specifically, at least twice a year and more frequently as needed, the audit committee and board receive reports on cybersecurity and information technology matters, and related risk exposures, initiatives, and readiness programs, among others, from management, including our Chief Administrative Officer and Chief Technology Officer. The audit committee also regularly updates the board on such matters, and the board periodically receives reports from management directly.

In addition, as part of the board's strategic and risk oversight, the board oversees our ESG strategies. Throughout the year, the board receives reports from management, including our Vice President of Sustainability and Chief Strategy Officer, and our nominating and corporate governance committee on key ESG matters, our actions around being a responsible company and corporate citizen, and our ESG reporting, which demonstrates our commitment to transparency and accountability of our goals and progress.

Our audit committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our compensation committee has responsibility to review the risks arising from our compensation policies and practices applicable to all employees and evaluate policies and practices that could mitigate any such risk. Our nominating and corporate governance committee has responsibility to review risks relating to our corporate governance practices, including ESG and other sustainability matters. These committees provide regular reports on our risk management practices to our board. Our board believes that the Company's current leadership structure supports its risk oversight function.

124.   On May 31, 2024, Petco filed a proxy statement on Form DEF 14A with the SEC (the "2024 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Yen, Breitner, Simmons, and Murphy to the Board and the compensation of certain of the Company's executive officers, including Defendants

Coughlin and LaRose.

125.   With respect to the Company's financial reporting processes and legal and regulatory compliance, the 2024 Proxy stated that the Audit Committee is responsible for "assisting our board of directors in its oversight responsibilities regarding the integrity of our financial statements, our compliance with legal and regulatory requirements, the independent accountant's qualifications and independence, our accounting and financial reporting processes, and the audits of our financial statements."

126.   With respect to the Company's risk management function, the 2024 Proxy stated:

> Our board believes that effective risk management and control processes are critical to Petco's safety and soundness, our ability to predict and manage the challenges that Petco and the pet category face and, ultimately, Petco's long-term corporate success.
>
> Management is responsible for the day-to-day oversight and management of our risk management framework, including strategic, operational, legal, compliance, cybersecurity, and financial risks, while our board, as a whole and through its committees, is responsible for the overall oversight of our risk management framework. Consistent with this approach, our enterprise risk steering committee comprised of key stakeholders throughout the Company works with management to identify, review, and update both the framework and certain specific short-, intermediate-, and long-term risks that we face, which are presented to our audit committee and board at regular audit committee and board meetings as part of management presentations that focus on particular business functions, operations, or strategies. Such presentations also identify steps taken by management to eliminate or mitigate such risks and report on how feedback from the audit committee and/or board regarding our enterprise risk management

efforts (including how we address existing risks and identify significant emerging risks) is implemented. In this process, we also utilize a heat map that identifies the probability and impact of inherent risks that we face, which is presented to our audit committee and board and updated regularly. While our board is ultimately responsible for the risk oversight of our Company, our audit committee has primary responsibility for management and mitigation of the risks facing our Company, including major financial, information technology, cybersecurity, privacy, and control risks, and oversight of the measures initiated by management to monitor and control such risks. Through the audit committee's formal oversight responsibility for cybersecurity, as delegated by our board of directors, it is responsible for reviewing our policies and procedures with respect to cybersecurity risk assessment and risk management. As part of the board of directors and audit committee's oversight, our Chief Administrative Officer, Chief Technology Officer ("CTO"), and/or Chief Information Security Officer ("CISO") provide semi-annual updates to the audit committee with respect to cybersecurity incidents, mitigation, threats, risks, and management, which are also communicated to the full board. For additional information regarding our cybersecurity risk assessment program, see our Annual Report on Form 10-K for the fiscal year ended February 3, 2024.

Our audit committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our compensation committee has responsibility to review the risks arising from our compensation policies and practices applicable to all employees and evaluate policies and practices that could mitigate any such risk. Our nominating and corporate governance committee has responsibility to review risks relating to our corporate governance practices, including ESG and other sustainability matters. These committees provide regular reports on our risk management practices to our board. Our board believes that the Company's current leadership structure supports its risk oversight function.

In addition, as part of the board's strategic and risk oversight, the board oversees our ESG strategies. Throughout the year, the board receives reports from management, including our Vice President of Sustainability and Chief ESG & Communications Officer, and our

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

nominating and corporate governance committee on key ESG matters, our actions around being a responsible company and corporate citizen, and our ESG reporting, which demonstrates our commitment to transparency and accountability of our goals and progress.

127.   On May 30, 2025, Petco filed a proxy statement on Form DEF 14A with the SEC (the "2025 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Mohan, Lubek, and Stadler to the Board and the compensation of certain of the Company's executive officers, including Defendants Anderson, Mohan, Coughlin, and LaRose.

128.   With respect to the Company's financial reporting processes and legal and regulatory compliance, the 2025 Proxy stated that the Audit Committee is responsible for "assisting our board of directors in its oversight responsibilities regarding the integrity of our financial statements, our compliance with legal and regulatory requirements, the independent accountant's qualifications and independence, our accounting and financial reporting processes, and the audits of our financial statements."

129.   With respect to the Company's risk management function, the 2025 Proxy stated:

Our board believes that effective risk management and control processes are critical to Petco's safety and soundness, our ability to predict and manage the challenges that Petco and the pet category face and, ultimately, Petco's long-term corporate success.

Management is responsible for the day-to-day oversight and management of our risk management framework, including strategic,

operational, legal, compliance, cybersecurity, and financial risks, while our board, as a whole and through its committees, is responsible for the overall oversight of our risk management framework. Consistent with this approach, key stakeholders throughout the Company work with management to identify, review, and update both the framework and certain specific short-, intermediate-, and long-term risks that we face, which are presented to our audit committee and board at regular audit committee and board meetings as part of management presentations that focus on particular business functions, operations, or strategies. Such presentations also identify steps taken by management to eliminate or mitigate such risks and report on how feedback from the audit committee and/or board regarding our enterprise risk management efforts (including how we address existing risks and identify significant emerging risks) is implemented. As part of this process, we determine the top risks for the Company by assessing the probability and impact of inherent risks that we face. These top risks are presented to our audit committee and board and updated regularly. While our board is ultimately responsible for the isk oversight of our Company, our audit committee has primary responsibility for management and mitigation of the risks facing our Company, including major financial, information technology, cybersecurity, privacy, and control risks, and oversight of the measures initiated by management to monitor and control such risks. Through the audit committee's formal oversight responsibility for cybersecurity, as delegated by our board of directors, it is responsible for reviewing our policies and procedures with respect to cybersecurity risk assessment and risk management. As part of the board of directors and audit committee's oversight, our Chief Technology Officer ("CTO") and/or Chief Information Security Officer ("CISO") provide semi-annual updates to the audit committee with respect to cybersecurity incidents, mitigation, threats, risks, management, and prevention, which are also communicated to the full board. In addition, a cross-functional committee comprised of key stakeholders throughout the Company meets regularly to review cybersecurity incidents, mitigation, threats, risks, management, and prevention. For additional information regarding our cybersecurity risk assessment program, see our Annual Report on Form 10-K for the fiscal year ended February 1, 2025.

Our audit committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any

related person transactions. Our compensation committee has responsibility to review the risks arising from our compensation policies and practices applicable to all employees and evaluate policies and practices that could mitigate any such risk. Our nominating and corporate governance committee has responsibility to review risks relating to our corporate governance practices, including sustainability and corporate responsibility matters. These committees provide regular reports on our risk management practices to our board. Our board believes that the Company's current leadership structure supports its risk oversight function.

In addition, as part of the board's strategic and risk oversight, the board, through our nominating and corporate governance committee, oversees our sustainability strategies. Throughout the year, the nominating and corporate governance committee receives reports from management, including our Chief Legal Officer, and our Senior Manager of Sustainability, on key sustainability matters, our actions around being a responsible company and corporate citizen, and our sustainability reporting, which is regularly shared with the full board.

130.   The proxy statements identified above, disseminated to the investing public during the Relevant Period, contained statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because, despite descriptions of the Board's and its committees' oversight responsibilities with respect to internal controls and the Company's risk management function, the Board and its committees were failing to adequately exercise these functions and were causing and/or permitting the Company to issue the materially false and misleading statements detailed herein.

## **DAMAGE TO THE COMPANY**

131.   As a direct and proximate result of the misconduct detailed above, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Action.

132.    These damages also include the costs of remediating deficiencies in the Company's procedures and controls and compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Petco.

133.    Furthermore, as a direct and proximate result of the misconduct detailed herein, Petco has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

134.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

135.    Petco is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

136.    Plaintiff is a current shareholder of Petco and was a continuous shareholder of the Company during the period of the Individual Defendants'

wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

137. A pre-suit demand on the Board of Petco is futile and, therefore, excused. At the time this action was commenced, the eleven-member Board was comprised of Defendants Murphy, Anderson, Mohan, Yen, Breitner, Briggs, Chande, Lake, Lubek, Stadler, and Sullivan (the "Director Defendants"). Accordingly, Plaintiff is only required to show that six directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

138. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

139. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross

negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

140. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

141. Defendant Anderson is not disinterested or independent and is therefore incapable of considering a demand. Defendant Anderson has served as the Company's CEO since July 2024. Thus, the Company admits that Defendant Anderson is a non-independent director. Further, Defendants Anderson and Mohan are not disinterested or independent because they are named as defendants, and face significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

142. Defendants Mohan, Yen, Breitner, and Briggs served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all

relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

143.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

144.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the

Director Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

145.    Due to longstanding business relationships, separate from their service on the Board of the Company, Defendants Stadler, Chande, Breitner, Lubek, and Sullivan have irreconcilable conflicts that could interfere with their judgment and thus lack the requisite independence and disinterestedness to vigorously prosecute this action. Specifically, Defendants Stadler, Chande, and Breitner are each affiliated with CVC. Accordingly, Defendants Stadler, Chande, and Breitner are particularly indebted to one another, giving rise to a conflict of interest that has precluded these directors from adequately monitoring the Company's operations and holding each other accountable. Similarly, Defendants Lubek and Sullivan are each affiliated with CPP Investments. These directors' affiliations with CVC and CPP Investments additionally give rise to a substantial conflict of interest because they allow these directors to exert significant control and influence over the Company. Specifically, CVC and CPP Investments are the sole members of Scooby GP LLC, a member-managed limited liability company. Scooby GP LLC is the general partner of Scooby LP, the sole member of Scooby Aggregatory GP, LLC, which is the Company's majority and controlling shareholder. Accordingly, and for all of the reasons set forth above, Defendants Stadler Chande, Breitner, Lubek, and Sullivan cannot exercise independent objective judgment about whether to bring this action or whether to

vigorously prosecute this action.

146.   Defendants Anderson, Mohan, and Murphy, as current or former senior executives, have received significant compensation from the Company in the form of salaries and stock awards which have created substantial conflicts of interest. Specifically, during 2024, Defendant Anderson received $18,258,291, Defendant Mohan received $10,598,130, and Defendant Murphy received $11,420,537 in compensation from the Company. Defendant Mohan further owns 1.7% of the Company's total outstanding shares of Class A common stock, and Defendant Murphy owns 1.5% of the Company's total outstanding shares of Class A common stock.

147.   The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

148.   The acts complained of herein constitute violations of fiduciary duties

owed by Petco's officers and directors, and these acts are incapable of ratification.

149.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Petco. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Petco, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

150.    If there is no directors' and officers' liability insurance, then the directors will not cause Petco to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

151.    Thus, for all of the reasons set forth above, all of Petco's current

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

**Against the Individual Defendants for Violations of § 14(a)
of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

152.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.   The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

154.   The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the Company's proxy statements filed with the SEC during the Relevant Period. As alleged above, these filings contained materially false and misleading statements concerning the Company's risk management function and its internal controls over financial reporting.

155.   The 2021 Proxy was used to solicit shareholder votes in connection with the election of Defendants Coughlin, Biagosch, Breitner, and Simmons to the Board. The 2022 Proxy was used to solicit shareholder votes in connection with the election of Defendants Lake, Mohan, Pereira, and Stadler to the Board. The 2023 Proxy was used to solicit shareholder votes in connection with the election of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants Briggs, Chande, and Sullivan to the Board. The 2024 Proxy was used to solicit shareholder votes in connection with the election of Defendants Yen, Breitner, Simmons, and Murphy to the Board. Lastly, the 2025 Proxy was used to solicit shareholder votes in connection with the election of Defendants Mohan, Lubek, and Stadler to the Board.

156.   In addition, the Company's proxy statements issued during the Relevant Period were used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Nuzzo, Coughlin, Anderson, Mohan, and LaRose. While these shareholder votes were non-binding, each of the relevant proxy statements indicated that the results of the votes would inform future compensation decisions. For instance, the 2025 Proxy represented that the "board of directors and the compensation committee will review and consider the results of this [vote] when making future compensation decisions for our Named Executive Officers."

157.   Describing the Company's executive compensation practices, the 2025 Proxy further indicates that compensation is performance-based, stating that the Company aims to "align executive pay with performance" and that the "[m]ajority of [executive officer] target compensation is at-risk."

158.   The materially false and misleading statements contained in the proxy statements issued during the Relevant Period regarding the Company's risk management function and its internal controls over financial reporting therefore

misleadingly induced shareholders to vote in favor of the election of Defendants Coughlin, Biagosch, Breitner, Simmons, Lake, Mohan, Pereira, Stadler, Briggs, Chande, Sullivan, Yen, Murphy, and Lubek and performance-based compensation to Defendants Nuzzo, Anderson, Mohan, Coughlin, and LaRose, to which they were not entitled.

159.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duty

160.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

162.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

163.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate

64
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

interests.

164. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

165. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

166. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

complained of herein.

168.   Plaintiff, on behalf of Petco, has no adequate remedy at law.

## COUNT IV

**Against the Individual Defendants**
**For Unjust Enrichment**

169.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Petco.

171.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Petco that were tied to the performance or artificially inflated valuation of Petco, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

172.   Plaintiff, as a shareholder and a representative of Petco, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

173.   Plaintiff, on behalf of Petco, has no adequate remedy at law.

## COUNT V

**Against the Individual Defendants
For Waste of Corporate Assets**

174.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

176.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

177.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

178.   Plaintiff, on behalf Petco, has no adequate remedy at law.

## COUNT VI

**Against Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and
Nuzzo for Contribution Under Section 10(b) and 21D of the Securities
Exchange Act of 1934**

67
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

179.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180.  Petco, along with Defendants Anderson, Mohan, Coughlin, Simmons, LaRose, and Nuzzo (the "Officer Defendants"), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

181.  The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Petco securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

182.  If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

183.  The Officer Defendants, because of their positions of control and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

184.   Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

185.   As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.   Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Directing Petco to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Petco and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

D.     Awarding punitive damages;

E.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

70

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Dated: August 1, 2025

**RIGRODSKY LAW, P.A.**

By:   */s/ Gina M. Serra*
Gina M. Serra (#361172)
1091 N. Palm Canyon Drive,
Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-8009
Email: gms@rl-legal.com

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

Samir Aougab
825 East Gate Boulevard,
Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sa@rl-legal.com

*Attorneys for Plaintiff*

71
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT